UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Oracle Real Estate Holdings I LLC,

Plaintiff,

- against -

Adrian Holdings Company I, LLC,
Adrian Holdings Company II, LLC,
Peter J. Adrian,

Defendants.

1:08-cv-07882-RJH

**MEMORANDUM OPINION**

This litigation concerns a Florida real estate deal between Oracle Real Estate Holdings I LLC ("Oracle"), Adrian Holdings Company I, LLC ("Adrian I"), and Adrian Holdings Company II, LLC ("Adrian II") dating from January 2007. On October 24, 2008, the Court issued a preliminary injunction requiring Adrian I to transfer to Oracle voting control of Adrian II, a limited measure of the relief that Oracle is entitled to under the Profit Sharing Agreement governing the deal if an "Event of Default" occurs. This opinion sets out the Court's reasons for granting the injunction.

## BACKGROUND

The Court makes the following findings of fact based on the undisputed evidence in the declarations and exhibits submitted in connection with Oracle's motion for a preliminary injunction. *See* Fed. R. Civ. P. 52(a). Additional findings of fact are set out as necessary in the "Discussion" section, below.

## I. Parties

Plaintiff Oracle is a limited liability company incorporated under the laws of New York. (Compl. ¶ 8.) Through intermediaries, Oracle is exclusively owned by Sudhin Roy, a resident of New York, and Carl M. Bouckaert, a resident of Georgia. *Id.* According to its website, one of the "transaction structures" Oracle specializes in is "Rescue Financings." (Oracle Partners, Company, http://www.oracle-partners.com/company.php?id=139 (last visited Oct. 27, 2008).)

Defendants are Peter J. Adrian, Jr. (also known as Pedro J. Adrian, Jr.), Adrian I, and Adrian II. Mr. Adrian is a resident of Florida; Adrian I and II are Delaware limited liabilities companies. (Compl. ¶¶ 9-10.) Both Adrian I and Adrian II are wholly owned through intermediate holding companies by Mr. Adrian. (*Id.*) According to the website of the Adrian Development Group, the Adrian family of companies is "an unquestioned leader not only in the South Florida market, but also throughout the rest of Florida as well." Adrian Development, About Us, http://www.adriandevelopmentgroup.com/about-us/ (last visited Oct. 27, 2008). Except where more detail is necessary, the Court refers to the three Adrian defendants collectively as "Adrian."

## II. The January 2007 Deal

In January 2007, Mr. Adrian and Oracle entered into a transaction to develop real estate in Florida. At the outset, Adrian I transferred five real estate holding companies to Adrian II, an entity newly formed for the purpose of the transaction. (Decl. of Peter J. Adrian in Opp'n to Pl.'s Req. for a Prelim. Inj., Oct. 13, 2008, ¶ 5 ("Adrian Decl.").) Each of the five holding companies (or "subsidiaries") owns an unimproved parcel of Florida real estate as follows: Adrian Development at Baker LLLP owns a property named "Cedar Creek." Bahia Honda Real Estate Investments IV, L.L.C. owns a property named "Stolen Hours." Adrian Real Estate

Investments II, L.L.C. owns a property named "Indian River Park of Commerce." Bahia Honda Real Estate Investments V, L.L.C. owns a property named "Vero Village." And Adrian Development at Pebble Walk Partnership LLLP owns a property named "Pebble Walk." (Compl. ¶ 12; Dep. of Pedro J. Adrian, Jr., Decl. of David W.T. Daniels in Supp. of Pl.'s Req. for Prelim. Inj., Oct. 14, 2008, Ex. G, at 43-44 ("Adrian Dep.").)

After Adrian I transferred the subsidiaries to Adrian II, both Adrian companies and Oracle entered into a profit sharing agreement (the "PSA" or "agreement") to capitalize Adrian II. In exchange for a $25 million investment from Oracle, Adrian II agreed to pay Oracle a percentage of net proceeds from the sale or refinancing of the real estate owned by the subsidiaries according to a formula set out in the agreement. (PSA Preamble; § 3.) Oracle, however, acquired no rights in the management and control of Adrian II, which remained wholly owned by Adrian I, and thus by Mr. Adrian. (PSA § 1 ("Holdings"); Adrian Decl. ¶ 5.)

The following diagram summarizes the transaction; intermediate holding companies are omitted for clarity:



The agreement contains a number of provisions designed to protect Oracle's investment, three of which are particularly relevant to this motion.  First, § 13(d) requires Adrian II to quarterly certify that no "Event of Default," as defined in § 10 of the agreement, occurred during the previous quarter.  Under § 10(b), an Event of Default occurs if:

> any representation, warranty or certification made by the Company ["Adrian II"] in this Agreement or in any document executed or delivered from time to time relating to this Agreement is materially untrue or intentionally misleading in its recital of any facts at the time as of which such representation, warranty or certification, as the case may be, is made[.]

As claimed by Oracle, the apparent purpose of the provision is "to make the Company's operations and performance transparent to Oracle so that it could monitor its interest in the Company and take steps to protect it where necessary."  (Pl.'s Mem. of Law in Supp. of Req. for Order to Show Cause for Prelim. Inj. with TRO, Sept. 17, 2008, at 4.  ("Pl.'s Mem.").)

Second, § 14.2(c) prohibits Adrian II and the subsidiaries from encumbering the real estate at the center of the transaction:  "Until payment in full of all obligations under this Agreement, [Adrian II] will not permit its Subsidiaries to . . . [m]ortgage, assign, pledge, transfer or permit any Lien other than Permitted Subsidiary Liens."  A "Lien" is defined in § 1 of the agreement as "any encumbrance, mortgage, pledge, hypothecation, charge, assignment, lien, restriction or other security interest of any kind securing any obligation of any Person."  (PSA § 1 ("Lien").)  "Permitted Subsidiary Liens," discussed more below, include ten types of security interests.  (*Id.* ("Permitted Subsidiary Liens").)

Third, § 13(j) of the agreement broadly requires Adrian II and the subsidiaries to comply with all laws and regulations "material to their businesses or assets."

The PSA creates a powerful remedy for Oracle in the event that Adrian II fails to pay it the profits it is owed or otherwise defaults on the agreement. In particular, under § 2, if Oracle is not paid by a specified expiration date, Adrian I must "transfer to [Oracle] 100% of the Membership Interests and any other Ownership Interests in [Adrian II] for no additional consideration." Critically, § 10 provides that if any of several "Event[s] of Default" occur, Oracle may immediately invoke the transfer provisions of § 2.

The agreement also provides that "[n]o remedy shall be exclusive of any other remedy." PSA § 20. And § 19, entitled "Acknowledgment of Member," provides in upper-case text:

> THE COMPANY'S [Adrian II's] MEMBER [Adrian I] HEREBY ACKNOWLEDGES AND CONSENTS TO THE RIGHTS AND REMEDIES GRANTED TO THE HOLDER [Oracle] ON ACCOUNT OF THIS AGREEMENT AND EXPRESSLY ACKNOWLEDGES THAT IT MAY BE REQUIRED TO TRANSFER TO THE HOLDER 100% OF THE MEMBERSHIP INTERESTS OF THE COMPANY FOR NO ADDITIONAL CONSIDERATION AS PROVIDED IN SECTION 2.

## III.  Subsequent Events

## A.  The First Amendment

For reasons that the current record does not reveal, the parties on November 6, 2007 signed a "First Amendment to Profit Sharing Agreement." (Roy Decl. Ex. B ("First Amendment").) In exchange for the contribution of a sixth property holding company to Adrian II, Adrian Developers of De La Fuente Parcel Corp., Oracle waived certain of its rights under the original agreement. Specifically, § 4.1 of the First Amendment provides that Oracle

> hereby consents, notwithstanding anything set forth in Section 3.2, 13(g) or 14.1(g) of the Agreement or otherwise in the Agreement, to the distribution by Company and/or Holdings to PJA (or any of PJA's Affiliates) of the balance of the proceeds contained in the New Property Acquisition Reserve (as defined in the Agreement, without giving effect to this First Amendment) on the Effective Date.

Section 3.2 of the original agreement addresses the distribution of proceeds from Cedar Creek and any other new property acquired by a subsidiary of Adrian II. Section 13(g) establishes an eight million dollar reserve for the acquisition of new properties. And § 14.1(g) establishes restrictions on payments by Adrian II.

Section 4.1, however, is not a general waiver of Oracle's rights. To the contrary, the immediately following section of the First Amendment provides:

> The waiver set forth above shall be limited precisely as written and relate solely to the waiver of the provisions of the Agreement in the manner and to the extent described above, and nothing in this Waiver shall be deemed to . . . constitute a waiver of compliance by [Adrian II] with respect to any other term, provision or condition of the Agreement . . . . (First Amendment § 4.2.)

This section also provides that "[e]xcept as expressly set forth herein, the terms, provisions and conditions of the Agreement shall remain in full force and effect and in all other respects are hereby ratified and confirmed." (*Id.*)

## B. Certifications

On November 13, 2007, February 13, 2008, and May 14, 2008, Mr. Adrian, acting on behalf of Adrian II, submitted quarterly certifications to Oracle. The certifications provided that "no default or event of default has occurred under any of the Subsidiaries' credit facilities." (Decl. of Sudhin Roy in Supp. of Pl.'s Req. for Order to Show Cause for Prelim. Inj. and TRO, Sept. 11, 2008, Exs. D, E ("Roy Decl.").) In addition, two undated certifications with identical language appear in the record. (*Id.* Ex. D.) Mr. Roy testified that these were submitted sometime in 2007. (*Id.* ¶ 13.)

## C. Late Payments on Ocean Bank Credit Facilities

The certifications notwithstanding, Adrian failed to make timely payments on several of the subsidiaries' credit facilities throughout 2007 and 2008. The clearest evidence of this

involves two notes that the Indian River and Pebble Walk subsidiaries secured from Ocean Bank in 2005.  (Daniels Decl. Exs. M (Pebble Walk note), O (Indian River note) ("Daniels Decl.").)

The Pebble Walk note provides that interest payments are due thirty days from the date of signing, June 8, 2005, and monthly thereafter.  (Daniels Decl., Ex. M, at 1.)  If a payment is more than ten days late, the interest rate increases to eighteen percent per annum until payments are brought up to date.  (*Id*.)  As evidenced by at least three past due notices, Adrian failed to make timely payments on the note throughout 2007.  (Daniels Decl. Exs. N (past due notice dated Feb. 13, 2007); S (past due notice dated May 8, 2007); V (past due notice dated Nov. 12, 2007).)  The last notice states that it is a "FOURTH NOTICE" and that payment is one month past due; it demands immediate payment of $11,024,681.43.  (Daniels Decl. Ex. V.)

The Indian River note provides that "[m]onthly payments of interest only . . . shall be due and payable in full."  (Daniels Decl. Ex. O, at 1.)  It also provides that "[w]hile in default, this Note shall bear interest at the rate of *the highest rate of interest then allowed under the laws of the State of Florida*."  (*Id.* at 2 (emphasis in original).)  If payments are not timely received, the interest rate on the note increases to "the maximum rate then permitted by applicable law."  (*Id.*)  The record contains two past due notices relating to the note, dated May 13, 2007 and December 17, 2007.  (Daniels Decl. Exs. R, Y.)  The May notice states that it is a "FOURTH NOTICE," while the December notices states that it is a "FIFTH NOTICE."  (*Id.*)  The December notice warns: "YOUR PAYMENT IS NOW PAST DUE.  DO NOT JEOPARDIZE YOUR CREDIT.  COME IN AND SEE US."  (Daniels Decl. Y.)

Adrian's failure to make payments on the notes continued in 2008.  (Adrian Decl. ¶ 32; Roy Decl. ¶¶ 14-16.)  Thus, Mr. Adrian testified that he has not made any payment, principal or interest, on the notes since January:

Q:      When's the last time you made payments on the Ocean Bank facilities?

A:      As of—if I'm correct, it was January '08.

Q:      January of '08.  So there have been no payments made on any Ocean facilities, and those are the three mortgages you testified to earlier this morning, as well as the line of credit, correct?

A.      Right.

(Peter J. Adrian Dep., Oct. 11, 2008, at 155, Daniels Decl. Ex. G ("Adrian Dep.").)

The record further shows that Adrian defaulted on a $13,495,000 line of credit that Ocean Bank extended to the Vero Village, Indian River, and Pebble Walk subsidiaries in 2006.  The master promissory note governing the line of credit provides that "Interest only shall be due and payable monthly commencing August 3, 2006, and on the third (3rd) day of each succeeding month thereafter during the term of this Note"; that the borrower "shall pay all amounts owing under this Note in full when due without set-off, counterclaim, deduction or withholding for any reason whatsoever"; and that an "Event of Default" occurs if any payment due under the note is more than ten days late.  (Daniels Decl. Ex. K, at 1.)  If an Event of Default occurs, Ocean Bank immediately acquires the option to accelerate the note.[1]  *Id.* at 1-2.  Again, as Mr. Adrian

---

[1] In this respect, the note provides:

> If default be made for ten (10) days in the payment of any sums payable pursuant to the terms of this Note, or if, subject to the expiration of any grace period, default or other event causing the acceleration of this Note occur under [various mortgage documents] (an "Event of Default"), then or at any time thereafter at the option of Bank, the whole of the principal sum then remaining unpaid hereunder, together with all interest accrued thereon and all other sums owing under the Loan Documents, shall immediately become due and payable without notice . . . .

Daniels Decl. Ex. K, at 1-2.

concedes, no payments have been made on the line of credit since January 2008. (Adrian Decl. ¶ 32; Roy Decl. ¶¶ 14-16; Adrian Dep. 155.)

**D.      Ocean Bank Foreclosures**

On June 27, 2008, Ocean Bank, the primary lender for Indian River, Vero Village, and Pebble Walk, notified Adrian that it was accelerating three notes and the $13,495,000 line of credit secured by Vero Village, Indian River, and Pebble Walk. (Roy Decl. Ex. F.) On October 3, 2008, the bank filed foreclosure actions against Adrian in Florida state court. (Compl., *Ocean Bank v. Adrian Dev. at Pebble Walk P'ship LLLP, et al.*, No. 08-59415 CA 21 (Fla. Cir. Ct. Oct. 3, 2008) (Daniels Decl., Ex. B); Compl., *Ocean Bank v. Bahia Honda Real Estate Inv. IV, LLC, et al.*, No. 20082433 CA 09 (Fla. Cir. Ct. Oct. 3, 2008) (Daniels Decl., Ex. C).)

Except for the Indian River property, the subsidiaries' properties have not been physically improved since the PSA was signed. (Adrian Dep. 154.) Adrian has, however, secured "entitlements" for the properties, i.e., approvals or permits from governmental agencies for development.   (Adrian Decl. ¶ 8.) None of the subsidiaries' properties presently has freestanding buildings, dwellings, or other structures. (*Id.* at 155.)

**IV.      Procedural History**

On September 10, 2008, Oracle filed suit against the Adrian defendants, invoking federal diversity jurisdiction. *See* Compl. Preamble; ¶ 6. The complaint alleged claims for breach of contract against Adrian I and Adrian II, and claims for fraud, and negligent and intentional misrepresentation against Adrian I, Adrian II, and Mr. Adrian. (*Id.* ¶¶ 38-47.) As relief, Oracle demanded specific performance of the PSA; preliminary and permanent injunctions; compensatory damages; attorneys fees and costs; and any other relief this Court may deem just and appropriate. *Id.* ¶ 47.

That same day, Oracle also requested a temporary restraining order limiting defendants'
authority over the Adrian entities. On September 11, 2008, the Part 1 Judge of this Court
(Lynch, J.) signed a temporary order, entered on September 15, 2008, enjoining Adrian I, Adrian
II, and Peter J. Adrian from (1) exercising any management authority or control outside of the
ordinary course of business with respect to the assets and property of Adrian I and its
subsidiaries; (2) transferring equity interests in Adrian I and its subsidiaries without the consent
of Oracle; (3) entering into or modifying credit facilities without the consent of Oracle; and (4)
taking any action to restructure, reorganize or liquidate Adrian I and its subsidiaries. *See* Order
to Show Cause for Prelim. Inj. with TRO, at 2. That order expired automatically pursuant to
Rule 65(b)(2). *See* Fed. R. Civ. P. 6(a)(2).

On September 11, Oracle also requested a preliminary injunction directing Adrian I "to
take all steps necessary to transfer 100% of its ownership interests in [Adrian II], including the
right to select the management of the Company, during the pendency of this action." Pl.'s Mem.
20. The Court held a hearing on Oracle's request for a preliminary injunction on October 14,
2008, at which all parties were present. Both parties rested on the affidavits and exhibits
submitted in support of and opposition to Oracle's motion and no witnesses were called. The
Court heard additional oral argument eight days later, on October 22, 2008.

## DISCUSSION

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be
granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v.
Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A Charles Alan Wright, Arthur R. Miller, &
Mary Kay Kane, *Federal Practice and Procedure* § 2948 (2d ed. 1995)). Thus, a plaintiff
seeking a preliminary injunction ordinarily must show (1) "irreparable harm absent injunctive

relief" and (2) "either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in plaintiff's favor." *Almontaser v. N.Y. City Dep't of Educ.*, 519 F.3d 505, 508 (2d Cir. 2008). Where the plaintiff seeks a "mandatory" injunction that will alter the status quo, it "must meet the more rigorous standard of demonstrating a 'clear' or 'substantial' showing of a likelihood of success on the merits." *Id.*

Though there is some uncertainty about what forms of relief change the status quo in contract cases,[2] the Court concludes that in light of the remedy Oracle seeks, the heightened standard applies. *See, e.g.*, *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27 (2d Cir. 1995) (heightened standard applied where plaintiff sought to enforce contract licensing right); *Castle Creek Tech. Partners, LLC v. CellPoint, Inc.*, 2002 WL 31958696, No. 02 Civ. 6662 (GEL) (S.D.N.Y. 2002) (heightened standard applied where creditor sought to enforce option to convert debt to shares). Accordingly, Oracle must show (1) irreparable harm and (2) a "clear" or "substantial" likelihood of success on the merits. As Oracle has met this standard, it is entitled to injunctive relief.

---

[2] The confusion is a result of the parties' diverging understanding of what constitutes the status quo ex ante. As the Second Circuit has explained:

> A plaintiff's view of the status quo is the situation that would prevail if its version of the contract were performed. A defendant's view of the status quo is its continued failure to perform as the plaintiff desires. To a breach of contract defendant, any injunction requiring performance may seem mandatory.

*Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995).

# I.      Irreparable Harm

"The premise of the preliminary injunction is that the remedy available at the end of trial will not make the plaintiff whole . . . ." *American Hosp. Supply Corp. v. Hospital Prods. Ltd.*, 780 F.2d 589, 594 (7th Cir. 1986).  Thus, the threshold issue is whether if injunctive relief is not granted Oracle faces a "likelihood of irreparable injury."  *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 108 (2d Cir. 2003).  Oracle argues that absent injunctive relief, it will lose a unique, bargained-for contractual remedy: the right to meaningful control of Adrian II.  *See* Pl.'s Mem. 10.  The Court finds that this injury would constitute irreparable harm.

The general standard for identifying irreparable harm is uncontroversial:  "If an injury can be appropriately compensated by an award of monetary damages, then an adequate remedy at law exists, and no irreparable injury may be found to justify specific relief."  *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004); *see Boery v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991).

Whether the loss of a contractual right meets this standard, however, demands a careful analysis of the right at issue.  Finding irreparable harm in the loss of contractual rights too readily would effectively replace damages with specific performance as the default remedy for breach of contract, an inefficient result that would risk making even prohibitively expensive performance compulsory.  *See America Hosp. Supply Corp.*, 780 F.2d at 594.  Thus, as the Second Circuit has cautioned, not all bargained-for contractual provisions provide a basis for injunctive relief, since a rule to this effect "would eviscerate the essential distinction between compensable and non-compensable harm."  *Wisdom Import Sales Co.*, 339 F.3d 101, 114 (2d Cir. 2003).  On the other hand, where the contract right has "intrinsic value" that cannot easily be quantified, the bargained-for provisions may provide a basis for injunctive relief.  *Id.*

*Wisdom Import* well illustrates the rule.  There, the defendants, entities associated with Labatt Brewing, and the plaintiff, the Wisdom Import Sales Company, entered into a joint venture agreement that gave Wisdom a minority veto over certain fundamental changes in the joint venture.  *See id.* at 104-05.  The district court found that the defendants likely breached the agreement by approving the integration of new brands into the venture over the objection of Wisdom and issued a preliminary injunction enjoining defendants from taking any further action on the integration.  *Id.* at 105, 107.  Upholding the injunction, the Second Circuit explained that although the right Wisdom sought to enforce was a product of contract, it had "intrinsic value" that could not easily be valued: "Wisdom expressly negotiated for and received the right to veto certain transactions with which it disagreed before those transactions commenced, a right that is irretrievably lost upon breach, and may not be compensable by non-speculative damages."  *Id.* at 114.  The Court accordingly held that "the denial of bargained-for minority rights, standing alone, may constitute irreparable harm, for purposes of obtaining preliminary injunctive relief where such rights are central to preserving an agreed-upon balance of power . . . in corporate management."  *Id.*

Also instructive, though not controlling, is the analysis of two decisions from this district, *United Acquisition Corp. v. Banque Paribas*, 631 F. Supp. 797 (S.D.N.Y. 1985) and *Castle Creek Technology Partners*, 2002 WL at 31958696.  In *United Acquisition*, which is cited approvingly in *Wisdom*, *see* 339 F.3d at 114, the district court found that the denial of a controlling interest in a corporation could constitute irreparable harm before denying a preliminary injunction on the merits.  *Id.* at 805.  The court also noted that the ultimate relief sought is a relevant factor in the irreparable harm question, reasoning that "in a case where

specific performance would be appropriate, since the remedy at law is inadequate, a finding of irreparable harm in the denial of an injunction would also be appropriate." *Id.*

In *Castle Creek Technology Partners*, the plaintiff, Castle Creek, sought to enforce a provision in the defendant's convertible notes that allowed the notes to be converted for shares of the defendant's common stock. Relying on the doctrine that a defendant's imminent insolvency can constitute irreparable harm, *see Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999), the district court found irreparable harm in the substantial possibility that any remedy available to Castle Creek would meaningless by the end of litigation: "If CellPoint is no longer a going concern at the close of litigation, an injunction ordering the delivery of CellPoint shares would be pointless, and Castle Creek would be left without the converted shares and without the option of obtaining a money judgment for the outstanding debt amount, thus suffering irreparable injury." *Castle Creek Technology Partners*, 2002 WL at 31958696 at *3.

The loss Oracle seeks to prevent shares a number of characteristics with the losses found to constitute irreparable harm in the cases just discussed. Specifically, Oracle seeks to enforce (1) a bargained-for right to corporate control (2) that is difficult if not impossible to value, which (3) could be meaningless or substantially diminished in value by the end of litigation absent injunctive relief. First, the agreement reflects a clear understanding that Oracle is entitled to take control of Adrian II if an "Event of Default" occurs. Section 10 plainly provides that in that case, Oracle may "declare that any such succeeding date is the Default Expiration Date and exercise its rights under Section 2 of this Agreement" and "exercise any and all other rights and remedies it may have under other agreements and under applicable law." Second, the value of control over Adrian II is almost entirely a function of the skill and resources of the party who

exercises control. To an unskilled and uncapitalized investor, Adrian II is little more than many

acres of heavily indebted, undeveloped land; to a Warren Buffet, it is perhaps a significant

investment opportunity. Third, time is of the essence. As noted above, three Adrian subsidiaries

are the subject of foreclosure proceedings. Finally, the Court notes that if Oracle prevails, it will

likely be entitled to specific performance. Although it is not clear that this alone establishes

irreparable harm, it provides additional support for the Court's conclusion.

## II.      Likelihood of Success on the Merits

Oracle claims that Adrian caused two principal "Events of Default" that trigger § 2's

mandatory transfer provision. After discussing the general standards governing the interpretation

of the agreement, the Court addresses each in turn.

## A.      Contract Interpretation Principles

In accordance with its choice-of-law clause, the Court interprets the agreement under

New York law. PSA § 24; *see, e.g.*, *Bank of Amer. Nat. Trust and Sav. Ass'n v. Envases

Venezolanos, S.A.*, 740 F. Supp. 260, 265 (S.D.N.Y. 1990), *aff'd*, 923 F.2d 843.

"In interpreting a contract under New York law, 'words and phrases . . . should be given

their plain meaning,' and the contract 'should be construed so as to give full meaning and effect

to all of its provisions.'" *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195,

206 (2d Cir. 2005) (alterations in original; quoting *Shaw Group, Inc. v. Triplefine Int'l Corp.*,

322 F.3d 115, 121 (2d Cir. 2003) (citation and internal quotation marks omitted). "[A]n

interpretation of a contract that has 'the effect of rendering at least one clause superfluous or

meaningless . . . is not preferred and will be avoided if possible.'" *Id.* at 206 (alterations in

original; quoting *Shaw Group, Inc.*, 322 F.3d at 124).

In addition, where a contract contains an express condition of performance, the traditional rule is that the condition "must be literally performed." *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.*, 660 N.E.2d 415, 418 (N.Y. 1995). As the Court of Appeals explained, "[t]hough the court may regret the harshness of such a condition, as it may regret the harshness of a promise, it must, nevertheless, generally enforce the will of the parties unless to do so will violate public policy." *Id.*

## B.     False Certifications in Connection with Defaults on Subsidiary Credit Facilities

Oracle first argues that Adrian allowed three of the subsidiaries to default on their credit facilities, then misrepresented that no default had occurred in quarterly certifications it was required to file with Oracle under § 13(d) of the agreement. As noted above, § 13(d) requires Adrian to quarterly certify that "no default or event of default has occurred under any of the Subsidiaries' credit facilities, or if a default or an event of default has occurred, the actions taken by such Subsidiary with respect thereto of the occurrence of any default or event of default." Section 10(b) provides that an "Event of Default" occurs if any of these certifications is "materially untrue or intentionally misleading."

On November 13, 2007, February 13, 2008, and May 14, 2008, Adrian certified that no default had occurred under the subsidiaries' credit facilities. (Roy Decl. Exs. D, E.) In light of the subsidiaries' repeated failures to make timely payments on their credit facilities, the Court finds that Oracle has demonstrated a substantial likelihood of success as to whether these certifications were materially untrue. Specifically, the Court finds that (1) Adrian first defaulted on the Pebble Walk note by February 13, 2007, *see supra* p. 6; (2) Adrian first defaulted on the Indian River note by May 13, 2007, *see supra* p. 7; (3) the defaults on the Pebble Walk and Indian River notes continued in 2008, *see supra* p. 7; and (4) Adrian defaulted on the line of

credit secured by Vero Village, Indian River, and Pebble Walk by February 11, 2008, at the latest, *see supra* p. 8.

Adrian does not dispute that it received past due notices throughout 2007 or stopped paying the Ocean Bank notes completely in January 2008. Rather, it offers several arguments for why the certifications nevertheless failed to trigger an Event of Default under the agreement. The Court does not find these arguments persuasive.

### 1. The First Amendment Did Not (and Could Not) Waive the Event of Default Resulting from the November 13, 2007 Certification

With respect to the 2007 defaults, Adrian argues, citing Mr. Roy's deposition, that "the First Amendment to the Agreement cured these purported events of default." Defs.' Supp. Mem. of Law in Opp'n to Pl.'s Req. for Prelim. Inj. 7 (Oct. 24, 2008) ("Def.'s Supp. Mem.") (citing Sudhin Roy Dep., Oct. 10, 2008, Decl. of D. Cameron Moxley in Opp'n to Pl.'s Motion for a Prelim. Inj., at 109-10 ("Roy Dep.")). This argument finds no support in either Mr. Roy's deposition or the First Amendment. In the cited pages of his deposition, Mr. Roy testified that the First Amendment cured a default that occurred when "monies that had needed to be set aside in what we refer to as an acquisition reserve had actually been taken out of the acquisition reserve and been used for other purposes." Roy Dep. 109. He nowhere suggests that the amendment cured Events of Default arising out false certifications. The First Amendment itself waived certain of Oracle's rights relating to the distribution of proceeds from new properties acquired by the subsidiaries and payments by Adrian II; it did not waive § 10(b). *See supra* p. 5. And in any event, a certification stating that no subsidiary had defaulted on its credit facilities was sent November 13, 2007—seven days *after* the date of the First Amendment. *See* First

Amendment, Preamble ("THIS FIRST AMENDMENT . . . is dated as of November 6, 2007 . . . .").[3]

*2. Ocean Bank's Decision to Accelerate in June 2008 Is Irrelevant to Whether Defaults Occurred Under the Notes*

Adrian next argues that the certifications were accurate when made because Ocean Bank did not declare a default and accelerate the notes until June 27, 2008. *See* Defs.' Mem. of Law in Opp'n to Pl.'s Req. for a Prelim. Inj., Oct. 4, 2008, 14-15 ("Defs' Mem."); Adrian Decl. ¶ 32; Roy Decl., Ex. F. (June 27, 2008 Ocean Bank notice of default). But this is at odds with how "default" is used in the notes, as well as the plain meaning of that term. The Pebble Walk note, for instance, provides that "[w]hen in *default* and after the expiration of any applicable grace period, this Note shall bear interest at the rate of EIGHTEEN PERCENTR [sic] (18.0%) per annum." (Daniels Decl. Ex. M, at 2 (emphasis added).) Similarly, the line of credit provides that an "Event of Default" occurs "[i]f *default* be made for ten (10) days in the payment of any sums payable pursuant to the terms of this Note . . . ." (Daniels Decl. Ex. K, at 1 (emphasis added).)

Since "default" is undefined in the Ocean Bank agreements, the Court interprets the term in its everyday sense—as a synonym for "non-payment." *See The American Heritage Dictionary of the English Language* 475 (4th ed. 2000) (defining "default" as "Failure to perform a task or fulfill an obligation, especially failure to meet a financial obligation: *in default on a loan*." (def. 1)); *Webster's Third New International Dictionary Unabridged* 590 (2002) ("to fail to fulfill a

_____

[3] Adrian also suggests that the Court cannot rely on Events of Default that occurred in 2007 because Oracle failed to plead them in its complaint. Defs.' Supp. Mem. 7. "The court should freely give leave [to amend a complaint] when justice so requires." Fed. R. Civ. P. 15(a)(2). Thus, Oracle's failure does not materially affect the likelihood that it will succeed on the merits.

contract or agreement to accept a responsibility, or to perform a duty" (def. 2)); 4 *Oxford English Dictionary* 370-71 (2d ed. 1989) ("Failure to act; neglect; *spec.* in *Law*, failure to perform some legal requirement or obligation" (def. 3.a.); "Failure to meet financial engagements; the action of defaulting in money matters." (def. 7)); Bryan A. Garner, *Black's Law Dictionary* 428 (7th ed. 1999) ("The omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due."). The subsidiaries were plainly in "default" in this sense: they had contractual obligations to pay principal and interest on the notes when due, but (as Adrian concedes) failed to do so. Moreover, at least with respect to the line of credit, Adrian's default has ripened into an Event of Default, which occurs if any payment is more than ten days late. It is undisputed that no payments have been made on this facility for the past nine months.

### 3. The Misrepresentations in the Certificates Were Material

Adrian next argues that any misrepresentation in the February 13 and May 14, 2008 certifications was immaterial, because Adrian provided other financial information to Oracle that was accurate. Defs.' Mem. 16. For example, Adrian claims that "[a]nyone reading the March 2008 Total Indebtedness Schedule would have known that two of the Ocean Bank mortgages matured in February 2008 with the full amount of the mortgages outstanding." *Id.* at 15. Thus, Adrian appears to argue that the certificates, if false, were not materially untrue. Defs.' Supp. Mem. 11-12.

This argument ignores all the defaults that occurred but were not disclosed in 2007. It also overlooks the underlying purpose of the PSA's reporting provisions. As noted above, those provisions correct a rather obvious information asymmetry between Adrian and Oracle: while Oracle capitalized a large part of the deal, Adrian possessed most of the important financial information about the subsidiaries. Combined with the severe penalty provisions of §§ 2 and

10(b), § 13(d)'s certification requirement created a powerful mechanism for Oracle to monitor the health of its investment. It required disclosure not just of whether Adrian made timely payments on its credit facilities, but of what steps Adrian took to cure a default in the event that it failed to make the proper payments. This is no small point, as delays in payment can be an early warning sign of impending financial problems. *See* Roy Decl. ¶ 21 ("It would have been extremely important to Oracle to have learned about these defaults earlier than it did. If it had done so, Oracle could have taken the steps it has now taken to protect its interests at an earlier date.").

Thus, even if it were possible to derive the fact that Adrian had stopped paying the Ocean Bank notes from certain of its monthly reports (a contested factual issue the Court does not resolve now), the effect of Adrian's false certifications was to deprive Oracle of *other* timely information material to the health of its investment. To illustrate, Adrian failed to timely pay interest on the Indian River note as early as February 2007, and by November 2007 had received from Ocean Bank a demand for immediate payment of $11,024,681.43. But it appears that it was not until March 2008—at the earliest—that Adrian disclosed financial information from which one could infer that the full principal and interest on that note was due and owing. (*See* Moxley Decl. Ex. P ("Total Indebtedness-Schedule 02.29.08").) Moreover, prior to that date the false certifications apparently concealed not only the fact of non-payment, but the extent of default, its cause, and the steps Adrian took to cure it. Adrian's argument that Oracle could have discovered the truth if only it chose not to rely on the certifications and instead audited Adrian's statements not only imposes a burden on Oracle that under the agreement belonged to Adrian, but assumes that once a default was discovered, Oracle could have launched an investigation that would have revealed the missing information. This is more weight than the concept of

"materiality" can bear. *See, e.g.*, *Neder v. United States*, 527 U.S. 1, 16 (1999) ("In general, a false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.' (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995))).

### 4. Section § 13(b) of the PSA Does Not Rescind § 10(b) Sub Silentio

Finally, Adrian argues that under § 13(b) of the agreement, which is entitled "Books and Records," no Event of Default occurred because "the certifications would have needed to have been *intentionally* untrue, misleading or inaccurate." Defs.' Supp. Mem. 9.

The final clause of § 13(b) provides:

> The parties hereto agree and acknowledge that it shall only be a breach of Sections 13(b), 13(d), 13(e), 13(k), 13(1), 13(m) or 13(q) if [Adrian II] (i) intentionally provides untrue, misleading or inaccurate books and records, (ii) does not allow [Oracle] to visit and inspect the premises of the Company for the reasons stated herein or (iii) refused to provide the information requested by the Company [sic] for the reasons stated herein.

As noted above, § 13(d) obligates Adrian II to quarterly certify both that no Event of Default has occurred under the agreement and that no subsidiary has defaulted on any of its credit facilities.

Loosely interpreted, § 13(b) might suggest that Adrian should not suffer any negative consequences from providing a false certification unless it also simultaneously engages in one of § 13(b)'s forbidden activities. The argument goes as follows: Under § 13(b), providing a false certification does not breach § 13(d) unless Adrian simultaneously engages in a forbidden activity—i.e., unless it intentionally provides misleading books or records, or denies Oracle access to the company's offices or information. If merely providing a false certification cannot breach § 13(d), it makes no sense that doing so could trigger § 10(b), since the remedy for triggering § 10(b) is much more severe than the ordinary remedy for breach of contract,

expectation damages. Section 10(b) must therefore be read in pari materia with § 13(d): what does not breach § 13(d) *cannot* trigger § 10(b).

As a matter of formal contract interpretation, this interpretation leaves something to be desired. Section 20 of the agreement expressly recognizes that remedies under the agreement are not exclusive, and § 13(b) does not purport to limit § 10 in any way. The premise of the loose interpretation is that the Court should ignore these provisions, look behind the words of the contract to identify the parties' "real" intentions, then apply those intentions to limit the scope of a condition absolute on its face. As the Court of Appeals has explained, however, "the fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent, and . . . the best evidence of what parties to a written agreement intend is what they say in their writing." *Innophos, Inc. v. Rhodia, S.A.*, 882 N.E.2d 389, 391-92 (N.Y. 2008) (alterations omitted).

At best, § 13(b) could be read to limit the scope of the affirmative covenant in § 13(d); however, it should not be interpreted to effectively read § 10(b) out of the agreement. *See LaSalle Bank Nat. Ass'n.*, 424 F.3d at 206. If § 10(b) cannot be triggered absent an event listed in § 13(b), Adrian could even provide an "intentionally misleading" quarterly certification as long as it did not *also* provide intentionally misleading books and records. This result, the Court believes, is one the parties could not possibly have intended. While the proper interpretation of § 13(b) may not be free from doubt, the plain language of § 10(b) proscribes materially untrue *or* intentionally misleading certifications, and the Court will apply that provision as it was written.

In any event, assuming arguendo that Adrian is correct and that a violation of § 10(b) should be read to require both materiality and intentionality, the record presently before the court raises a strong inference that at least through February or March of 2008, Adrian was

consciously withholding material information from Oracle. On September 20, 2007, William F.

Mueller, the chief financial officer of Adrian Development Group, sent an email to Mr. Adrian

warning him of an "existing default" that needed to be cured before Adrian's next quarterly

certification and, as important, disclosed even if cured.[4] While the current record does not

indicate whether Mr. Adrian responded to Mr. Mueller's email, it is clear that defaults whether or

not cured continued through throughout 2007 with respect to the Indian River and Pebble Walk

notes, and that Adrian's November 13, 2007 certification that "no default or event of default has

occurred under any of the Subsidiaries' credit facilities" was materially untrue when made.

**C.     Failure to Pay Property Taxes**

Oracle next argues that Adrian II caused an event of default by failing to pay its property

taxes and allowing tax liens to arise on its properties. The Court again concludes that Oracle has

demonstrated a clear likelihood of success on the merits.

*1. Florida's Property Tax System and Adrian's Failure to Pay 2006 and 2007 Taxes*

---

[4] The email reads in relevant part:

> I have brought to your attention on various occasions over the last two months
> that we need to cure the existing default. Our end of quarter reporting is coming
> up at the end of September and it is my opinion that the default should be cured
> before then. At this point, we will be required to state that a default existed but
> that it has been cured (assuming you cure). If we don't cure it, we will be required
> to report that a default exists.
>
> In the past, Sudhin has mentioned that Oracle has a lot of flexibility in working
> with us except when it comes to a default issue. Once Oracle calls a default,
> Sudhin's hands will be tied and their attorneys will handle the issue. I will call
> you on Monday to discuss this. Thanks.

Daniels Decl. Ex. U.

Under Florida law, ad valorem real estate taxes become "due" each year on November 1. Fla. Stat. Ann § 197.333 (West 2008); *see also* § 197.322(2) (describing procedure for notice of taxes). If unpaid, the taxes become a first priority lien on the real property on January 1 the following year. § 197.122. Taxes become "delinquent" and must be paid on April 1 in the year following the one in which they are assessed, or "after 60 days have expired from the mailing of the original tax notice, whichever is later." § 197.333; *see* § 197.122 ("All owners of property shall be held to know that taxes are due and payable annually and are charged with the duty of ascertaining the amount of current and delinquent taxes and paying them before April 1 of the year following the year in which taxes are assessed."). If the taxes remain unpaid by June 1, the state may sell a "tax certificate"—"a legal document, representing unpaid delinquent real property taxes . . . and becoming a first lien thereon . . . ." § 197.102(3); *see* § 197.432 (requiring tax collector to "commence the sale of tax certificates on those lands on which taxes have not been paid" on day designated in notice of sale); Fla. Admin. Code Ann. r. 12D-13.045 (2008) (setting June 1 sale date). Such a certificate "is a contract between the state and the purchaser thereof who is granted by such certificate the benefit of the laws of the state in force at the time securing and defining his rights under it." *State ex rel. Seville Holding Co. v. Draughon*, 173 So. 353, 354 (Fla. 1937) (interpreting 1935 statute). However, the holder of a certificate "may not . . . initiate contact with the owner of property upon which he or she holds a tax certificate to encourage or demand payment until 2 years have elapsed since April 1 of the year of issuance of the tax certificate." § 197.432(14).

Although Adrian had a duty to pay taxes by April 1, *see* § 197.122, it has not yet paid the 2006 or 2007 taxes for Indian River, Vero Village, and Pebble Walk. As Mr. Adrian testified in

his deposition, "In '06 we paid '05, so we haven't paid '06 and '07 taxes." Adrian Dep. 161.[5]

Oracle contends that Adrian's failure to pay these taxes violated two aspects of the agreement: § 13(j), prohibiting violations of the law, and § 14.2(c), prohibiting the subsidiaries from encumbering their assets.

### 2. The "Comply with Law" Clause

Section 13(j) of the agreement provides that "[t]he Company shall comply, and cause its Subsidiaries to comply, with all federal, state and local laws, regulations and orders applicable to the Company and its Subsidiaries or their assets in all respects material to their businesses or assets . . . ." As noted, Florida Statutes § 197.122 charges property owners with the duty of paying property taxes "before April 1 of the year following the year in which taxes are assessed." Thus it is clear that Adrian's failure to pay taxes literally violated the law within the meaning of § 13(j).

The Court finds that this violation of the law was also material to the subsidiaries' businesses and assets. Although § 13(j)'s language suggests an intent not to trigger an "Event of Default" based on trivial violations of the law that do not negatively affect the subsidiaries' business—that is, to allow an "efficient breach" of the law where the costs of compliance exceed the costs of the penalty for breaking it—this is not what happened here. Rather, as Mr. Adrian explained, the primary reason Adrian II did not pay the subsidiaries' property taxes is because,

---

[5] A spreadsheet prepared and produced by Adrian shows $131,913.12 in outstanding 2006 taxes on Indian River; $531,545.72 in outstanding 2006 taxes on Pebble Walk; and $119,033.58 on Vero Village. (Daniels Decl., Ex. H.) An earlier spreadsheet prepared by Oracle based on public records shows $131,913.07 in total outstanding taxes on Indian River; $232,913.56 in total outstanding taxes on Pebble Walk; and $118,552.10 in total outstanding taxes on Vero Village. (Roy Decl., Ex. I.)

unable to obtain refinancing, it was out of cash. (Adrian Dep. at 180-81.[6]) In this context—where Adrian II could not comply with the law without personal loans from Mr. Adrian—the subsidiaries' failure to pay taxes was plainly "material to their businesses or assets."

Citing § 12.7 of the PSA and an accompanying schedule, Adrian claims that Oracle effectively waived § 13(j) because it knew that "the common practice of real estate developers in Florida" is to not pay taxes until a tax certificate is issued and becomes collectable. Defs' Mem. 14. Adrian thus appears to argue that the PSA contains an implicit agreement that the subsidiaries were not required to pay taxes until their property was at actual risk of foreclose. As

---

[6] Mr. Adrian's explanation of the subsidiaries' tax liabilities culminated in the following exchange with counsel for Oracle:

> Q.      . . . If I understand you, Mr. Adrian, what you're telling me, if we can cut to the bottom line, is that there wasn't cash available to pay the taxes, and you were looking to refinance the properties at a future date. And at the time of that – those anticipated refinancings, you would take some of the capital you would get from the refinancing and allocate to it to the payment of real estate taxes?
>
> MR. WEIGEL: Objection to form. You can answer.
>
> A.      Well, there hasn't been cash in these properties coming anywhere, other than from my pocket, since the day we closed with the Oracle.
>
>         The – if you look at the Oracle agreement, there was contemplation in a bunch of loans coming into place to fund these projects, and build them and develop them, and take them forward, and none of that ever happened. So of course we were stretching the dollar, yes.
>
> Q.      And that put you in a very tough position?
>
> A.      Well, it put me in a tough position, that put me in a tough position, we have been carrying all of this out of my pocket . . . .

Adrian Dep. 186-87.

support for this implicit agreement, Adrian points to § 12.7, which contains a representation that as of the date of signing,

> Except as set forth on Schedule 12.7, [Adrian I], [Adrian II] and its Subsidiaries have paid all taxes which are now due and payable, or, with respect to those taxes which are being contested in good faith, [Adrian I], [Adrian II] and its Subsidiaries have made an appropriate reserve on its financial statements for the same.

Schedule 12.7 lists $61,225.92 in 2006 taxes due for Indian River; $55,020.57 for Vero Village; $31,817.08 for Stolen Hours; $213,986.99 for Pebble Walk; and $40,805.00 for Cedar Creek.

As an initial matter, the Court observes that when the PSA was signed, the taxes listed on Schedule 12.7 were not "due *and payable*" for another two months. *See* Fl. Stat. § 197.122. This hardly bespeaks an agreement that Adrian did not have to pay 2006 and 2007 taxes when payments was due on April 1, 2007 and one year thereafter. Moreover, to the extent that Mr. Adrian's testimony suggests an oral side agreement waiving § 13(j), any such agreement would be unenforceable. The PSA's merger clause provides that "[t]his Agreement supersedes all prior agreements and understandings between the parties to this Agreement, both written and oral, with respect to such subject matter." A side agreement that, notwithstanding § 13(j), the subsidiaries were not required to pay taxes plainly falls within the scope of this clause.

*3. The "No Liens" Clause*

Section 14.2(c) provides that "[u]ntil payment in full of all obligations under this Agreement, [Adrian II] will not permit its Subsidiaries to . . . Mortgage, assign, pledge, transfer or permit any Lien other than Permitted Subsidiary Liens." As relevant here, "Permitted Subsidiary Liens" include "Liens securing taxes or other governmental charges not yet due or due but contested in good faith by appropriate proceedings and for which the Subsidiary has made appropriate reserves." PSA § 1 ("Permitted Subsidiary Liens," clause (b)). Under Florida

- 27 -

law, delinquent taxes subject to a tax certificate become a "first lien" on the property, with certain exceptions not applicable here. *See* Fla. Stat. Ann. 197.102(3) (West 2008); *see* § 197.573(2) (exceptions). Adrian has not suggested that the liens secure taxes and are contested. Accordingly, the Court concludes that as of April 1, 2007 (for 2006 taxes) and April 1, 2008 (for 2007 taxes), Adrian permitted the subsidiaries' properties to be encumbered by liens not permitted under the agreement.

Adrian's argument to the contrary is without merit. As Adrian reads it, the definition of "Permitted Subsidiary Leans," quoted above, is properly read to include (1) all "Liens securing taxes" and (2) "Liens securing . . . other governmental charges not yet due or due but contested in good faith . . . ." Defs' Mem. 13. This is rather like saying "dogs with floppy ears or other comical features that weigh less than twenty pounds" refers to (1) all floppy-eared dogs regardless of weight and (2) a limited class of dogs that (a) have comical features and (b) weigh less than twenty pounds. Such an interpretation defies ordinary usage. The more natural reading is that "Liens securing taxes or other governmental charges," like "dogs with floppy ears or other comical features," refers to a single class of objects, defined by reference to an exemplar and objects that are similar to it.[7]

---

[7] In addition to the Events of Default discussed thus far, Oracle argues that Adrian also triggered the PSA's transfer provision by allowing seven mechanics' liens to be created on the subsidiaries' properties. Pl.'s Mem. 16-17; Pl.'s Supp. Memo. in Supp. of Req. for Prelim. Inj. 9-10; *see* Roy Decl. Ex. J; Daniels Decl., Exs. DD-II. In light of the findings above, the Court need not address at this point whether the claims of lien cited by Oracle fall within the definition of "Permitted Subsidiary Liens." *See* Fl. Stat. Ann. § 713.05 (West 2008) (outlining conditions for creation of valid construction lien); *see, e.g.*, *Cleveland Trust Co. v. Ousley Sod Co.*, 351 So.2d 58, 59 (Fla. App. 1977) (noting that "a lien claimed by a person in privity with the owner . . . is *acquired* when a claim of lien is recorded").

### III.    Adrian's Other Defenses

Adrian makes a number of other arguments against granting injunctive relief, which the Court need only briefly consider.  Adrian first argues that ordering a transfer of Adrian II's equity to Oracle would violate its "equity of redemption"—the doctrine that "at no time before or after default may the creditor take the collateral for the debt and thus forfeit the debtor's surplus value or equity in the collateral."  *Indianapolis Morris Plan Corp. v. Karlen*, 268 N.E.2d 632, 634 (N.Y. 1971); *see* Defs.' Mem. 16.  In light of the preliminary relief that has been granted, the Court need not address this argument now.  Adrian, of course, remains free to renew its argument at trial or summary judgment.

Adrian next argues that Oracle is barred from seeking preliminary relief by the equitable doctrine of laches.  Defs.' Mem. 21; *see Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.,* 294 F.3d 383, 395 (2d Cir. 2002).  Essentially, Adrian contends that Oracle should have sought injunctive relief immediately when it first learned that Adrian had defaulted on the Ocean Bank notes in February 2008.  The record, however, shows that the parties have engaged in intermittent negotiations since March 2008.  (Adrian Decl. ¶ 32; Roy Decl. ¶ 19).  And Adrian has not demonstrated any prejudice that it has suffered as a result of Oracle's decision to bring suit in September.  Accordingly, the defense of laches is without merit.

Finally, Adrian argues that Oracle is not entitled to a preliminary injunction because the temporary restraining order entered September 15, 2008 unintentionally prevented the sale of the Indian River property, exacerbating Adrian II's financial situation.  Defs.' Mem. 20, 23-24.  "Courts apply the maxim requiring clean hands where the party asking for the invocation of an equitable doctrine has committed some unconscionable act that is 'directly related to the subject matter in litigation' and has injured the party attempting to invoke the doctrine."  *PenneCom B.V.*

*v. Merrill Lynch & Co., Inc.*, 372 F.3d 488, 493 (2d Cir. 2004) (quoting *Weiss v. Mayflower Doughnut Corp.*, 135 N.E.2d 208, 210 (1956)). On the current record, the Court cannot say that Oracle acted with knowledge that its actions would prevent the sale of the Indian River property, much less that its actions were unconscionable. And in any event, Adrian never moved to dissolve the temporary restraining order. *See* Fed. R. Civ. P. 65(b)(4). Accordingly, the Court finds that this defense is without merit.

## IV.    Remedy

Even where a plaintiff has demonstrated irreparable harm and a likelihood of success on the merits, equity requires preliminary relief that is "narrowly tailored to fit specific legal violations," and which does "not impose unnecessary burdens on lawful activity." *Waldman Publ. Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994). As the Supreme Court noted half a century ago, "it is the duty of a court of equity granting injunctive relief to do so upon conditions that will protect all whose interests the injunction may affect." *Bhd. of Locomotive Eng'rs v. Missouri-Kansas-Texas R. Co.*, 363 U.S. 528, 532 (1960) (alterations and citations omitted). *See* 11A Wright, Miller, & Kane § 2947, at 123-24 ("Implicit in the court's discretion under Rule 65(a) is that the court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case or may enter conditional preliminary relief.").

Here, the Court concludes that transferring voting control but not ownership of Adrian II to Oracle during the pendency of litigation will best protect Oracle's rights under the PSA while also protecting Adrian I's potential equity in Adrian II. While Oracle has demonstrated the potential for irreparable harm and a clear likelihood of success on the merits, it has not demonstrated that complete ownership of Adrian II is necessary to prevent the harms discussed above. Furthermore, a transfer of control but not ownership responds, if imperfectly, to the

problem that as a practical matter Oracle's business interests are solely to recover the value of its investment from Adrian II. Until a judgment on the merits is entered, Oracle likely owes fiduciary duties to the Adrian defendants, a sufficient protection for their remaining equity interests in Adrian II.

## CONCLUSION

To summarize, the Court finds that Oracle has demonstrated both a likelihood of irreparable harm absent injunctive relief and a substantial likelihood of success on the merits as to whether an Event of Default has occurred under the agreement. Ordering the full transfer of Adrian I's interests in Adrian II to Oracle is not necessary to protect Oracle's interests at this stage, however. Rather, the Court finds that transferring control of Adrian II to Oracle for the pendency of this litigation will best protect the competing interests of the parties pending trial on the merits. Finally, the Court notes that its discussion of the merits in this opinion in no way prejudges the outcome of the full trial, which of course "may cast the facts in a different light from how they appeared in the preliminary injunction proceeding." *American Hosp. Supply Corp.*, 780 F.2d at 600.

Dated: New York, New York
October 27, 2008

Richard J. Holwell
United States District Judge

- 31 -